WALKER MANUFACTURING COM-
PANY, Respondent, Appellant,

v.

Arthur Howard BLOOMBERG et al.,
Trustees, Appellees.

No. 5880.

United States Court of Appeals
First Circuit.

Jan. 31, 1962.

James D. St. Clair, Boston, Mass., with whom Robert L. Meade and Hale & Dorr, Boston, Mass., were on the brief, for appellant.

Daniel Needham, Jr., Boston, Mass., with whom Sidney J. Kagan, Boston, Mass., was on the brief, for appellees.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from an order of the United States District Court for the District of Massachusetts granting a temporary injunction against the appellant, Walker Manufacturing Company. The case grows out of a proceeding under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. for the reorganization of the appellee, the Bettinger Corporation.

The Bettinger Corporation (hereafter called Bettinger) is a Massachusetts corporation which specializes in the coating of metals with ceramic materials. In ad-

dition to its main plant in Milford, Massachusetts, it operates a plant in Toledo, Ohio. Walker Manufacturing Company (hereafter called Walker) is a Delaware corporation with a principal place of business in Racine, Wisconsin. Walker is a major manufacturer of automotive parts including mufflers and tailpipes and with especial reference to the instant proceedings is the exclusive supplier to the American Motors Corporation of all mufflers and tailpipes installed in the "Rambler" line of automobiles manufactured by American.

For some time prior to 1960, Bettinger conducted an extensive research and development program aimed at developing a process for the ceramic coating of both the exterior and interior surfaces of automotive mufflers and tailpipes. In 1960 Bettinger personnel were successful in developing an effective formula for a ceramic "slip",[1] and in perfecting the details of the unique manufacturing and production process essential to the ceramic coating of mufflers. Since the success of Bettinger's methods derived from both its "slip" and its production facilities, the combination of these factors have, for the sake of convenience, been given the designation of the "Bettinger process" in these proceedings.

Once this process had been perfected, in June of 1960 Walker and Bettinger entered into a production contract under which Bettinger agreed to ceramically coat all mufflers and tailpipes manufactured by Walker for use in connection with American's 1961 line of Rambler automobiles. Incident to this contract, Bettinger coated over five hundred thousand mufflers and four hundred fifty thousand tailpipes furnished to it by Walker for delivery to American.

On August 18, 1960 Walker and Bettinger executed a second agreement which was entitled a "Product Development Agreement." This agreement provided in part as follows:

"(2) *Research and Developmental Services.*

"Bettinger hereby agrees to render research and developmental services to assist Walker in a product development program aimed at the establishment of a product line of ceramic automotive parts. In connection with such services, Bettinger shall forthwith and continuously throughout the term of this agreement utilize and make unconditionally available to Walker its skills having possible application to the manufacture of ceramic automotive parts, including without limitation, information as to ceramic materials, ceramic techniques, methods, ingredients and all other scientific, engineering or other data of technical or economic value. Bettinger shall also assist Walker in connection with the various technical aspects relating to devising and improving upon processes for the manufacture of ceramic automotive parts including furnishing Walker with names of possible suppliers of raw material and equipment, engineering and development services and assistance in devising and establishing successful operation of facilities for the manufacture of ceramic automotive parts, and all other things necessary to enable Walker to manufacture for its own account. * * * "

Upon the execution of this agreement and pursuant to its terms, Walker paid Bettinger $50,000 for services which Bettinger was to furnish to Walker during the initial twenty-four months of the contract. In addition, another provision of the contract provided that if Walker should decide to construct its own plant and thereupon itself engage in ceramic coating of automotive parts, it would pay Bettinger an additional $50,000 for "research and development services" in the new Walker plant during the first two years of its operation. It was provided

---

[1]. "Slip" is the trade name for the ceramic composition which is applied to the metal in the coating process.

that this contract would extend for a term of twenty years but there was provision for an earlier termination upon the happening of stipulated contingencies. One of these contingencies gave Walker the right to terminate upon payment to Bettinger of $25,000 "on notice of thirty days and within six months after the happening of any act by Bettinger which makes it doubtful that Bettinger has the financial ability to continue active research. * * *"

Pursuant to this Product Development Agreement, Bettinger's personnel performed services as requested by Walker and there commenced an apparently full and free exchange of ideas and information on subject matter relative to the ceramic coating of mufflers and tailpipes.

On November 28, 1960 Bettinger filed a petition for an arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. On November 30, 1960 the Referee in Bankruptcy issued an order appointing receivers and authorizing and empowering Bettinger, as debtor-in-possession, to operate its business and manage its properties under the supervision of the receivers. The order of the referee appointing receivers and authorizing Bettinger to operate its business as debtor-in-possession also contained a provision aimed at restraining persons from taking into their possession any assets of the debtor. This order read in pertinent part:

"7. That all persons, firms, and corporations, their agents and attorneys, be and they hereby are enjoined and restrained from instituting or prosecuting or continuing the prosecution of any actions; suits or proceedings, at law or in equity, against the debtor, and from levying any attachment, executions or writs or processes upon the debtor or any of its assets or properties, or from taking or attempting to take into their possession any of the assets or properties of the debtor, or from doing any act or thing which may interfere with the possession or the management of the Debtor-in-Possession until further order of this Court."

After the date of this order Bettinger continued to render services to Walker pursuant to the agreement of August 18, 1960 and Walker made payments thereunder to Bettinger for such services.

On December 16, 1960, the Chapter XI Receivers of Bettinger petitioned the court to issue a Certificate of Indebtedness to Walker in the amount of $50,000 to evidence a loan by Walker to be made in that amount. A condition of this loan was that Walker should have the right to apply any amounts outstanding thereunder as a set-off against amounts which might be due Bettinger from Walker under the terms of the August 18th agreement. On December 16, 1960 the referee entered an order approving the issuance of such Certificate of Indebtedness upon the terms petitioned for and such a certificate was issued.

In January 1961, Walker sent one of its consulting engineers, a certain L. S. Bolton, to the Bettinger plant at Toledo, Ohio. His mission, which was undertaken with the express approval and consent of Bettinger officials,[2] was to make a detailed study of the Bettinger plant. Following his trip to the Toledo plant, Bolton submitted to Walker a report which contained a comprehensive description of the Bettinger production process and plant including blueprints, formulae and production details. Bolton also furnished a copy of this report to Bettinger officials.

On February 28, 1961, exercising its right of early termination under the "financial inability" proviso of the agreement, Walker notified Bettinger of its election to terminate said agreement. On March 13, 1961 the proceeding involving the Bettinger Corporation was

2. A Bettinger vice-president told officials at the Toledo plant that Bolton was to get "any and all information that he wanted so long as photographs were not taken."

amended from a Chapter XI arrangement to a reorganization under Chapter X of the Bankruptcy Act and trustees were appointed. On March 31, 1961 Walker in terminating the agreement presented a check in the amount of $25,000 to the trustees in reorganization. The check was accepted by the trustees unconditionally and deposited to their account.

During this period Walker commenced construction of its own ceramic coating plant at Racine, Wisconsin. On July 5, 1961 the trustees were advised by Walker that commencing July 17, 1961 the ceramic coating of all Walker's mufflers and tailpipes would be done at Walker's new plant and that no further mufflers or tailpipes would be sent to Bettinger for coating.

On July 11, 1961 the trustees filed in the district court a document entitled "Petition of Trustees to Establish Title to Assets and For Protection Thereof" which asserted that the district court had summary jurisdiction over Walker and sought a restraining order and injunction against Walker's use of the Bettinger process of coating automotive parts with ceramic materials.

In seeking this relief it was the trustees' position that Walker obtained the Bettinger process as a result of Bolton's survey of the Bettinger plant in January, 1961 and that such action was illicit; consequently, as the process was wrongfully obtained, Walker should be restrained from utilizing it.

In resisting this petition Walker took the position that the district court lacked summary jurisdiction over the subject matter of the trustees' petition and consequently that the court could not adjudicate the trustees' claim in a summary proceeding. Walker maintained that these claims could only be resolved in a plenary suit on the merits.

On July 27 and 28, 1961, a hearing was held to consider Walker's objection to the court's summary jurisdiction and its motion to dismiss and on the application of the trustees for a preliminary injunction. On August 8, 1961 the district court filed an opinion in which it held that it possessed summary jurisdiction to adjudicate the trustees' petition. On the same date the court ordered that a temporary injunction issue, restraining Walker from using or disclosing to others "data or information relating to the Bettinger process of coating automotive parts with ceramic materials." In re Bettinger Corporation, 197 F.Supp. 273, 278 (D.C. Mass.1961).

In sustaining its exercise of summary jurisdiction the district court concluded that the so-called Bettinger process was property and that on November 28, 1960, the date on which the Chapter XI petition was filed, this property "was owned by and was under the exclusive control of the debtor [Bettinger]." Consequently, having found that Bettinger had exclusive possession of the property at this time, the court reasoned that it possessed summary jurisdiction to dispose of any claims relating to said property and thereafter granted the relief which the trustees requested.

In issuing the injunction the court apparently concluded that Walker's action in sending Bolton to the Bettinger plant in January 1961 violated paragraph 7 of the order of the Referee in Bankruptcy cited above (that provision which enjoined anyone from taking the debtor's assets into their possession without permission of the court). Thus after referring to paragraph 7 and stating that its proscription embraced intangible as well as tangible property the district judge concluded:

> "Walker had no right to take over the use of the Bettinger process without the permission of this Court. It made no attempt to submit its claim to adjudication by the Court but chose instead to have recourse to self-help and to run the risk of colliding with the Court's control of the assets of the debtor-in-possession.
>
> "To permit claimants to take through self-help assets of a debtor-in-possession to which they believe

they are entitled but which have come under the control of the Court, would render impossible the orderly administration of the Bankruptcy Act and would imperil the rights of the remaining creditors.

"This Court has the power to use its injunctive powers to protect its jurisdiction and its control over the assets of a debtor-in-possession and to prevent the use of exploitation of an asset which appears to have been taken from such debtor without authority.

"The protection of this Court's jurisdiction and control over the Bettinger process, a substantial asset of the debtor, requires the issuance of a preliminary injunction pending the determination of the trustees' petition on the merits." Id. at 277–278.

In this court appellant urges two basic positions. Initially, as below, it contends that the district court lacked summary jurisdiction over Walker and the subject matter of the trustee's petition. Secondly, even assuming the existence of summary jurisdiction, Walker challenges the action of the trial judge in issuing an injunction against Walker on the facts of the present record and also challenges the correctness of the trial judge's apparent determination that Walker contravened the order of the Referee in Bankruptcy in not having secured the court's permission before attempting to gather the information contained in the Bolton report.

We turn then to the threshold question of whether the district court possessed jurisdiction to proceed summarily against the subject matter of the trustees' petition—the Bettinger process—or whether the conflicting claims of Walker and the Bettinger trustees should have been resolved in a plenary proceeding.

■ The determinative element in assessing whether, in a bankruptcy proceeding, a district court has summary jurisdiction over a particular *res* is the factor of possession. If the property at issue is in the hands of the debtor and he has come under the jurisdiction of the court in a bankruptcy proceeding, then it is well settled that the court possesses summary jurisdiction over such property. Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940); Duda v. Sterling Mfg. Co., 178 F.2d 428 (8 Cir. 1949). However, if the property is in the possession of a third party the district court does not possess summary jurisdiction to act concerning this property unless the third party's possession is predicated on a specious, colorable or patently insubstantial claim. In re Mt. Forest Fur Farms of America, 122 F.2d 232 (6 Cir. 1941); Duda v. Sterling, supra; 6 Collier on Bankruptcy, § 3.05 (14th ed.). In discussing these principles, the Supreme Court has stated:

"A bankruptcy court has the power to adjudicate summarily rights and claims to property which is in the actual or constructive possession of the court. Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 481, 60 S.Ct. 628, 629, 84 L.Ed. 876. If the property is not in the court's possession and a third person asserts a *bona fide* claim adverse to the receiver or trustee in bankruptcy, he has the right to have the merits of his claim adjudicated 'in suits of the ordinary character, with the rights and remedies incident thereto.' * * But the mere assertion of an adverse claim does not oust a court of bankruptcy of its jurisdiction. * * * It has both the power and the duty to examine a claim adverse to the bankrupt estate to the extent of ascertaining whether the claim is ingenuous and substantial. * * * Once it is established that the claim is not colorable nor frivolous, the claimant has the right to have the merits of his claim passed on in a plenary suit and not summarily. Of such a claim the bankruptcy court cannot retain further jurisdiction unless the claimant consents to its adjudication in the bankruptcy court. * * * " Cline v. Kaplan,

323 U.S. 97, 98, 99, 65 S.Ct. 155, 89 L.Ed. 97 (1944).

These well settled principles are easy of application in the situation where the particular property is tangible, precisely defined, and readily identifiable. It is much less so where, as in the instant case, the *res* is largely intangible and where knowledge, if licitly gained, may be equivalent to the physical possession involved where the subject matter is tangible.

■■ The ultimate question—so far as summary jurisdiction is concerned—is whether the Bettinger process was licitly transferred to Walker so that it gained an independent possession of the process prior to November 28, 1960, the date on which the district court initially assumed jurisdiction through the petition for arrangement. Walker maintains that such a transfer in fact took place so that, pertinent to the question of the summary jurisdiction of the district court, possession of the relevant subject matter was in the hands of a third party —Walker. Bettinger denies that such a transfer was contemplated or in fact took place and maintains that it had the determinative "possession" of the process at all relevant times. Being of a quasi-intangible nature the process clearly could be simultaneously in the possession of both Bettinger and Walker.

There is no question that on November 28, 1960, the critical date for present purposes, Bettinger had "possession" in the sense that they were assuredly aware of their own process—their ceramic slip and production facilities. However, as the process was conceptually capable of a severalty of "possession," we believe that the decisive question is whether Walker also legitimately had a severable and independent possession on November 28, 1960. We believe that in assaying whether the relevant *res* was in the possession of the debtor so that the district court could exercise summary jurisdiction or in the hands of a third party holding under a substantial claim of right, a distinction must be drawn between Bettinger's concededly residual possession of its own process and the assertedly legitimate and conceptually distinct possession which Walker may have gained of the process prior to November 28, 1960. In essence, the existence or non-existence of summary jurisdiction reduces itself to the question of whether the evidence supports the district court's finding that the "Bettinger process * * was owned by and under the *exclusive* control of [Bettinger] on November 28, 1960 * * * " (emphasis added) and the corollary conclusion that "Walker did not possess sufficient knowledge of the Bettinger process to be able to put it into operation or to exploit it until the consulting engineer submitted his report in January 1961." 197 F.Supp. 273 at 276–277. If, on November 28, 1960, it could be demonstrated that Walker had a concomitant control of the process, legitimately gained, then possession of the *res* would indeed be in a third party and assuming the existence of a substantial claim of right, exercise of summary jurisdiction would be improper. Cf. In re Mt. Forest Fur Farms of America, supra.

Walker has made a strong showing that it did possess the substance of the Bettinger process by November 28th. So far as the "slip" aspect of the process is concerned this was clearly in the possession of Walker prior to the critical date. Bettinger's formula for its slip is styed "Becote 40" and its consistency was apparently regarded as a true trade secret by Bettinger. Significantly enough, on October 20, 1960, this formula was directly and freely given to the representatives of Walker by the general manager of Bettinger, Mr. Meeker.

Moreover, the record indicates that Walker had a substantial knowledge of the Bettinger production techniques— the second aspect of the process. It was shown that Walker conferred with and itself advised Bettinger on certain aspects of the prospective production process prior to the time that Bettinger set up its production line and also that some details of this process were a joint effort of Bettinger and Walker.

Moreover, Meeker testified that many representatives of Walker and American Motors were in the Bettinger plant observing production techniques during the Bettinger's pilot run of its assembly line in April 1960. To all of these people Bettinger made a full disclosure of the plant according to Meeker. One of these individuals, a Mr. Lentz, supervisor of advance products developments for Walker, testified that he observed and reported every aspect of the production process to Walker prior to November 28, 1960.

Further, in late June 1960, a certain D. J. Wittingham, an employee of Walker, spent two days observing production techniques at the Bettinger plant in Toledo, Ohio, apparently with full permission of Bettinger. At the completion of his mission he submitted a comprehensive and detailed report of Bettinger's entire assembly line and production techniques to Walker. This report was received in evidence at the hearing. (Respondent's Exhibit F.)

In short, then, the heart of Walker's position is that it had possession of the substance of Bettinger's production facilities prior to November 28th and that the information gained through the Bolton report was merely—to use its own characterization—the "finer details" of Bettinger's production methods. Consequently, Walker argues, the district court's findings of exclusive possession in Bettinger and Walker's inability "to exploit" the process on November 28th, are unsupported.

Assuming, *arguendo*, that Walker did have knowledge of a good portion of the Bettinger production facilities on November 28th, such a showing would not cause us to set aside the district court's findings. The difficulty in Walker's position is that in dealing with a sophisticated and complex manufacturing process such as is involved here, knowledge of the "finer details" of the production line are frequently the most determinative elements in the success or failure of a given operation. In sum, the very essence of method may lie in the knowledge of its "finer details." The record indi-

cates that until the Bolton visit no individual (other than Bettinger personnel) had made an exacting technical survey of the plant. Bolton made such a survey, took extensive measurements and had technical talks with Bettinger employees which lasted over a three day period. Moreover, despite Walker's showing that it possessed at least a general knowledge of the Bettinger facilities—which knowledge was apparently freely given—the fact remains that Walker felt impelled to send Bolton to the Bettinger plant in January to make the subject survey. We may assume that it would not have undertaken this action if it felt sufficiently confident in the knowledge which it possessed prior to this time. Consequently, we believe that the district court's finding that until the Bolton visit (and subsequent to November 28), Walker lacked sufficient knowledge to "exploit" the process, is supported by the evidence. For these reasons we believe that the district court possessed summary jurisdiction.

Having determined that the district court possessed summary jurisdiction, the next question is whether it properly issued an injunction against Walker—whether Walker's sending of Bolton to the Bettinger plant in January constituted a resort to "self-help" and contravened the referee's order restraining all persons from taking into their possession any assets of the debtor.

As noted above, on August 18, 1960, under the terms of its Product Development Agreement, Bettinger agreed to "forthwith and continuously throughout the term of this agreement utilize and make unconditionally available to Walker its skills having possible application to the manufacture of ceramic automotive parts, including without limitation, information as to ceramic materials, ceramic techniques, methods, ingredients and all other * * * scientific, engineering or other data of technical or economic value * * * and all other things necessary to enable Walker to manufacture for its own account." Walker contends that the above-cited lan-

guage, under its express terms, clearly gave it the right to obtain all of Bettinger's "skills" *without limitation* relating to ceramic coatings. It contends that such an interpretation is impelled when considered in the light of the obvious objective and intention of an "establishment of a product line of ceramic automotive parts" for Walker and where the contract expressly provided for the possibility that Walker might manufacture ceramic automotive parts in its own facilities. It is Walker's position that Bolton's survey of the Bettinger plant in January was clearly within both the letter and the spirit of the above-cited language, under which authority it was undertaken.

The Bettinger trustees take the position that this agreement was prospective in nature and called solely for the transfer of any future developments which Bettinger might thereafter "conceive" under the contract. They argue that the agreement contemplated no transfer of the developments or "know-how" already in existence at the time of the execution of the agreement and consequently that Bolton was outside the contract in making his January survey of the Bettinger plant.

Whatever the precise import to be ultimately accorded the language of this agreement at a plenary hearing on the merits, its broadness certainly lends at least a surface validity to Walker's position. Moreover, it appears that the parties to this agreement apparently gave it the interpretation for which Walker contends.

When Bolton arrived at the Bettinger plant he informed Meeker, the general manager, that the purpose of his visit was to obtain "information necessary to make a complete report which would enable Walker to build a plant either at Racine or Jackson * * *." Meeker testified that he was aware of the Product Development Agreement and that he did not think it was extraordinary that Walker should be gathering this information for the purpose of building its own plant. Thereafter, he cooperated fully in sup-plying Bolton with whatever information the latter required. Moreover, Bolton's visit to the Bettinger plant was expressly authorized by a Mr. Shaw, a vice-president in charge of engineering for Bettinger who stated that Bolton was "to get any and all information that he wanted except that there were to be no photographs taken." Finally, after testifying that the idea of Walker's constructing its own plant had been discussed by November, 1960, Meeker testified:

"Q. * * * But this plant that was being discussed was to include the Bettinger process, so-called, wasn't it? A. It would eventually, yes.

"Q. Not just what had been discovered from August 18, 1960, up until November, 1960, was it? A. Oh, no.

"Q. It was to include the whole works, wasn't it? A. Absolutely."

Walker clearly acted openly relative to Bolton's visit. Bolton secured permission to visit the plant, stated the purpose of his business upon arrival and at the conclusion of his stay, submitted a copy of the results of his survey to Bettinger officials. In short, during this period at least, there does not appear to have been any doubt among the parties to the agreement that Walker had the right to obtain information relative to the "Bettinger process." It has been said that where there is doubt as to the express language of the agreement, the interpretation of the parties placed thereon should control. Eustis Mfg. Co. v. Saco Brick Co., 201 Mass. 391, 393, 87 N.E. 596 (1909); Restatement of Contracts, Section 235 E.

At all events, the contract of August 18, 1960 undoubtedly called for Bettinger to make available to Walker some of its expertise in the ceramic coating industry, whatever the precise limits of this expertise may later prove to be.

On November 28, 1960 when Bettinger filed its petition for an Arrangement under Chapter XI, and on November 30 when the referee issued an order ap-

pointing receivers, the Product Development Agreement of August 18 was executory. Under Chapter XI the receivers had the power and authority to reject or to continue to perform executory contracts. After November 30, 1960 Bettinger continued to render services to Walker incident to the agreement and Walker made payments thereunder to Bettinger for such services. It is undisputed that this contract was continued until March 31, 1961 when Walker chose to terminate it under a concededly proper right to do so. Since the agreement of August 18, concededly called for a transfer of expertise, it must have been obvious that by continuing the contract and rendering research and development services, Bettinger would necessarily have to make available to Walker some of its intangible assets. Since Bettinger and its receivers expressly chose to keep this contract in effect, we do not believe that Walker can be said to have violated paragraph 7 of the referee's order by acting, apparently in good faith, under the contract terms.

Furthermore, in holding that Walker resorted to "self-help" in not securing the court's permission before obtaining the Bolton survey, the district judge made no mention of the referee's order of December 16, 1960. As noted previously, this order called for the issuance of a Certificate of Indebtedness to Walker in consideration of a loan by Walker in the amount of $50,000 and expressly authorized Walker to set-off amounts that would become due to it on this loan against amounts that might become due to Bettinger because of the agreement of August 18, 1960. This order was issued two weeks *after* the order of November 30th which the court below found that Walker had violated.

Under these circumstances we believe that Walker not only did not have to secure the court's permission to continue receiving the Bettinger expertise under a contract which Bettinger, its receivers and trustees chose to keep in force, but, more significantly, that Walker in fact had the court's permission through the medium of the referee's order of December 16, 1960. We believe that the court's reference to "self-help" and running the "risk of colliding with the Court's control of the assets of the debtor-in-possession" is unwarranted and unjustified. Whatever may be the ultimate determination on the merits, we do not think the court has made the findings, or that the trustees have made the special showing, which would entitle them to preliminary relief.

The order of the district court entered on August 8, 1961, is vacated and the case is remanded to the district court for further proceedings not inconsistent with this opinion.