**In the Matter of: VAN DYK RESEARCH CORPORATION a New Jersey Corporation, Debtor.**

**VAN DYK RESEARCH CORPORATION, a New Jersey Corporation, Debtor and Bernard Hellring, Receiver for Van Dyk Research Corporation, Plaintiffs,**

v.

**SCM CORPORATION, a New York Corporation, Defendant.**

**Bankruptcy No. B–75–2568.**

United States Bankruptcy Court, D. New Jersey.

April 30, 1981.

Crummy, Del Deo, Dollan & Purcell by Frank J. Vecchione, Newark, N. J., for receiver.

Ravin & Kesselhaut by Mark Baumgarten, West Orange, N. J., for debtor.

Riker, Danzig, Scherer & Hyland, Newark, N. J., for SCM Corp.; Benjamin P. Michel, Newark, N. J., of counsel.

Janet L. Samuels, New York City (New York Bar) Staff Atty., for SCM Corp.

## OPINION

VINCENT J. COMMISA, Bankruptcy Judge.

The debtor has filed two actions against the SCM Corporation (hereinafter SCM). The first is a motion to expunge or reduce claim # 267 filed by SCM and the second is a verified complaint filed on July 27, 1976 wherein the debtor seeks to disaffirm and reject certain portions of an agreement between the parties. The complaint seeks other relief which will hereinafter be dismissed.

On October 3, 1975 the debtors filed a petition for arrangement under Chapter XI of the Bankruptcy Act. Thereafter, the Receiver was appointed and qualified to the position. Subsequently, on November 8, 1979 a plan of arrangement was confirmed by this Court, which retained jurisdiction to hear the verified complaint action and all matters relating to claims.

For some time prior to the filing of the Chapter XI petition, the debtor has been engaged in the business of developing, manufacturing and distributing xerographic plain paper copier machines.

On December 3, 1973 the debtor and SCM entered into a marketing arrangement whereby SCM agreed to purchase 2200 plain paper office xerographic copy machines manufactured by the debtor. The copiers, known as the "Van Dyk 4000," were to be marketed by SCM as the "SCM 6740". The contract was modified by amendments dated May 30, 1974, June 20, 1974 and November 21, 1974. Under said agreements, SCM also agreed to purchase accessories and spare parts from Van Dyk for the copier machine, including a sorter to collate copies and to be attached to the 6740 copier machine.

Under the December 3, 1973 Purchase Agreement, Van Dyk retained the right to increase prices for spare parts and supplies sold by it to SCM. Paragraph 5(b) of said Agreement provided:

(b) Van Dyk shall have the right, at any time, to increase the price of spare parts and supplies to reflect actual out-of-pocket increases in Van Dyk's wage, material or other costs or expenses properly allocable to such spare parts and supplies. Upon written request by SCM, the correctness of any such price increase shall be certified within ninety (90) days after such request by SCM by an independent Certified Public Accountant selected by Van Dyk and approved by SCM, such approval not to be unreasonably withheld; Van Dyk's present auditors, Giordano and Riddell are approved for this purpose by SCM. Van Dyk shall give SCM ninety (90) days prior written notice of any such price change, and the prices as changed shall not apply to SCM orders

received by Van Dyk before the expiration of said ninety (90) days to the extent that such orders can be filled from inventory then on hand.

Under paragraph 5(a) of said agreement, Van Dyk also warranted that all spare parts and accessories were free from defects of material and workmanship and agreed to "replace without charge... such spare parts and supplies which SCM, at SCM's costs, shall have returned to the Van Dyk facility designated for this purpose by Van Dyk."

Under the terms of the agreement, Van Dyk agreed to train SCM servicemen in the operation, maintenance, repair and service of the copier machines. Van Dyk, in fact, conducted training courses for SCM servicemen on the copier and the sorter.

Under the terms of the Purchase Agreement, SCM had the right to terminate its contract with Van Dyk. Such termination was conditioned upon SCM purchasing an additional 225 Van Dyk copier machines and reimbursing the debtor for its costs in the development of an "International Machine".

Subsequently on January 30, 1975 SCM gave notice of termination to Van Dyk and paid Van Dyk $4,100,000.00 as required under the agreements for future deliveries of the machines. SCM also paid Van Dyk an additional $100,000.00 for Van Dyk's work on the "International Machine". SCM asserts that it paid Van Dyk a total of approximately $33,700,000.00 for copiers, sorters, spare parts and training, in addition to the $100,000.00 for the International Machine.

After termination of its purchase agreement with Van Dyk, SCM continued to purchase spare parts from the debtor.

Van Dyk made no attempt to increase its prices for spare parts until after SCM terminated the agreement on January 30, 1975. By letter dated January 31, 1975 Van Dyk submitted a new price list to SCM, to become effective ninety (90) days after the receipt thereof. At this time, SCM acknowledged the fact that Van Dyk had, in fact, been underpricing its spare parts. On February 10, 1975 SCM, by letter, requested that Van Dyk certify the price increases in accordance with paragraph 5(b) of the Purchase Agreement. James T. Conway, SCM's Director of Internal Accounting in 1975, testified that Van Dyk never supplied the requested audit, since it did not have the original records of its pricing methods used in its 1973 pricing list, and could not assess its out-of-pocket expenses.

At this time, Conway met with representatives of Van Dyk to work out a new spare parts pricing arrangement. On May 7, 1975 an interim pricing agreement was reached under which SCM agreed to pay Van Dyk the new prices on the January 31, 1975 price list, "for a period of 60 days, subject to verification, and refund or adjustment". It was also agreed at this time that price increases would be audited and certified by Touche Ross annually, as part of Van Dyk's annual audit.

Van Dyk also agreed to supply, and did forward to SCM, an analysis of twenty-five (25) basic parts, to support the January, 1975 prices.

During this time, SCM paid all bills submitted by Van Dyk without protest, on a thirty (30) day basis.

A final agreement on the pricing of spare parts was reached in June 1975 and is contained in a series of letters dated June 2, 1975, June 5, 1975 and June 30, 1975. Under this agreement, Van Dyk agreed to price each part according to a certain format. Under this format, material costs and labor costs were to be added together to determine the costs of the goods sold. A figure representing "corporate burden" was added to attain the total cost. A profit figure of approximately twenty (20%) per cent of the selling price was then added to obtain the new selling price.

It was further agreed that revisions in the spare parts price list be done quarterly, and that the vice-president of finance for Van Dyk certify that such revisions conform with the agreed pricing format.

Van Dyk issued its first price list under this agreement on August 6, 1975, effective September 1, 1975. On September 26, 1975 Van Dyk issued to SCM an invoice for $302,832.32 representing a retroactive price adjustment for parts sold between April 1, 1975 and September 1, 1975. SCM has refused to pay this invoice, and denies that it represents any setoff against the sums due it from Van Dyk.

The original proof of claim filed by SCM on November 6, 1975 contained the following summary of claims:

| | |
|---|---|
| (i) Defective parts returned to Van Dyk for credit | $148,914.53 |
| (ii) Defective parts not yet returned to Van Dyk for credit | 19,961.52 |
| (iii) Defective drums received by SCM and currently in its possession | 84,312.54 |
| (iv) Copy paper paid for in advance by SCM but not delivered by Van Dyk | 69,088.00 |
| (v) Billing error | 101.01 |
| (vi) Purchase cost of drums failing to meet warranties | 219,836.04 |
| (vii) Labor cost of replacing drums failing to meet warranties | 22,673.40 |
| (viii) Expenses incurred by SCM as a result of inadequate Van Dyk training of SCM personnel, pursuant to contract | 442,932.00 |
| (ix) Cost of excessive SCM service personnel necessitated by inadequate Van Dyk training of SCM personnel pursuant to contract | 276,893.55 |
| Total | $1,284,711.59 |

In paragraph 8 of the proof of claim, SCM stated that the claims were not subject to any setoff or counterclaim of Van Dyk, and asserted that the September 25, 1975 invoice or $302,832.32 sent by Van Dyk to SCM, purportedly to represent a retroactive price increase, was unenforceable.

On December 13, 1979, by letter memorandum filed with the Court, the claim was reduced to $1,171,987.98 and was further adjusted during the trial to $1,189,063.38. The final figure includes the sum of $66,-646.00 representing an administrative claim for overcharging of spare parts by the debtor during the pendency of the Chapter XI proceeding.

On November 7, 1975 the debtor denied all of the claims filed by SCM except those covered by specific memos issued by the debtor to SCM. The debtor further reserved the right to counterclaim and setoff in the event that any damages resulted from SCM's alleged breach of the contract.

Subsequently on July 27, 1976 the debtor and the Receiver filed a verified complaint directed against SCM wherein the debtor (1) sought to reject and disaffirm certain executory aspects of its purchase agreement with SCM; (2) claimed the net sum of $85,726.28 as due from SCM, representing certain sums due SCM from Van Dyk, offset by the unpaid September 25, 1975 invoice of $302,832.32; (3) claimed the sum of $6,510,000.00 as damages and lost profits from SCM's failure to purchase the International Machine; (4) sought to expunge SCM's claim of $1,284,711.59; (5) claimed SCM tortiously interfered with the debtor's economic advantages by purchasing spare parts from certain vendors of Van Dyk; and (6) claimed that SCM hired a former Van Dyk employee, one Gerson Levitas, in violation of an agreement with the debtor prohibiting same.

On September 9, 1976 a stipulation of settlement was entered, dismissing Count Six of the Complaint dealing with Van Dyk's former employee, Levitas, and in regard to Count Five, counsel for Van Dyk agreed to furnish SCM with a list of spare parts for the SCM 6740 machine in which Van Dyk claimed a proprietary interest.

On April 11, 1977 Van Dyk moved to reduce the claim of SCM on the grounds that the books and records of the debtor company indicated a balance due the debtor from SCM of approximately $85,726.28, to designate the answer filed by Van Dyk, and its subsequent verified complaint as an answer and counterclaim to SCM's proof of Claim and to fix the time for discovery, pre-trial and trial on the merits of the claims asserted by the parties.

On April 21, 1977 SCM moved to dismiss Counts One, Three, Five and Six of the debtor's verified complaint, or alternatively, for summary judgment in its favor on these counts and to limit discovery on Counts Two and Four of said complaint.

Thereafter on September 2, 1977 SCM sought to amend its Proof of Claim to in-

clude a claim for indemnification from Van Dyk pursuant to the December 3, 1973 Purchase Agreement.

During the pendency of the Chapter XI proceeding, on September 27, 1976, the Xerox Corporation filed a patent infringement action against SCM in the United States District Court for the District of New Jersey. The complaint alleged that the use and sale by SCM of the SCM 6740 copier machine infringed certain patents owned by Xerox. On that same date, Xerox filed a complaint in this Court seeking relief from the automatic stay to institute a suit against the debtor by joining it as a party defendant in its patent infringement action against SCM.

On May 23, 1977 SCM filed a complaint in this Court to obtain relief from the automatic stay to file a third party complaint against the debtor in the Xerox case. On May 26, 1977 this Court denied Xerox relief from the automatic stay. On October 14, 1977 SCM's complaint for relief from the stay was also denied and SCM, by order of this Court of even date, was permitted to amend its Proof of Claim to seek indemnification from the debtor in the event of patent infringement liability, pursuant to their original contract to purchase the copier machines.

On December 13, 1979 counsel for SCM asserted that SCM's claims against Van Dyk were as follows:

1. Parts returns:
 a. Credit memos $148,914.53
 b. Parts refurbished;
 not refurbishable 24,886.16 _____$173,800.69
2. Overcharge for spare parts 334,085.34
3. Copy Paper 69,088.00
4. Training
 a. training cost 326,340.56
 b. service time 268,673.37 _____ 595,013.95
 TOTAL_____$1,171,987.98

At trial, SCM again reduced its training costs claim to $318,836.04 and reduced its service time claim to $245,257.00. SCM also reduced its claim for overcharges for spare parts to $317,706.34. In regard to its refurbishing claims, SCM withdrew its claim for the purchase cost of parts it did not return to Van Dyk because they were allegedly not refurbishable, but still asserted a claim for the cost of refurbishing parts allegedly fall-

ing under warranty, in the amount of $10,-944.10.

Van Dyk admits the validity of SCM's claim for $69,088.00 for copy paper paid for by SCM but never delivered to SCM, and $148,914.53, due on credit memos, issued by the debtor for defective parts SCM returned to Van Dyk. Van Dyk, however, asserts a setoff of $302,832.32, representing the unpaid September 25, 1975 invoice, resulting in a net amount due the debtor of approximately $84,829.79.

Thus, the remaining claims to be considered by this Court are: (1) SCM's claim for overcharging by Van Dyk for spare parts; (2) the right of Van Dyk to a setoff of $302,832.32; (3) SCM's claim for training costs and excess service time expended as a result of Van Dyk's inadequate training of SCM servicemen. The Court will address each of these claims, *seriatim.*

Section 57(a) of the Bankruptcy Act provides in part:

"A Proof of Claim filed in accordance with the requirements of the Bankruptcy Act... shall constitute prima facie evidence of the validity and amount of the claim." 11 U.S.C. § 93(a).

Accord *Whitney v. Dresser,* 200 U.S. 532, 26 S.Ct. 316, 50 L.Ed. 584 (1906); *Gardner v. New Jersey,* 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947).

The proof of claim establishes the debt for all purposes in the case unless (1) the objecting party denies it, and (2) produces evidence to the contrary. *In re Hannevig,* 10 F.2d 941 (2d Cir. 1925), *cert. den.* 270 U.S. 655 (1925); *Rasmussen v. Gresly,* 77 F.2d 252 (8th Cir. 1935). If objections are made to the allowance of the claim, the formal proof of claim raises a presumption which must be rebutted by affirmative proof. *In re Rubin,* 24 F.2d 289 (7th Cir. 1928), *cert. den. sub nom. Rubin v. Midlinsky,* 278 U.S. 609, 49 S.Ct. 13, 73 L.Ed. 535 (1928); *In re O'Gara & Maguire, Inc.,* 259 F. 935 (D.N.J.1919). The burden is on the objecting party to rebut the claim. *O'Gara & Maguire, supra* at 938. However, once the presumption in favor of the claimant is

overcome by affirmative proof, the burden falls on the claimant to prove his case by a preponderance of the evidence. *Rasmussen, supra* at 254.

In *Alexander v. Theleman,* 69 F.2d 610 (10th Cir. 1934), *cert. den.* 293 U.S. 581, 55 S.Ct. 94, 79 L.Ed. 677 (1934), the court summarized the prevailing view:

> "While the sworn statement of the claim is some evidence of its correctness, and is sufficient to carry the burden over formal objection unsupported by proof, *Whitney v. Dresser,* 200 U.S. 532, 26 S.Ct. 316, 50 L.Ed. 584, the burden is always upon the claimant; when substantial evidence is brought forward to dispute its correctness, the question is, on the entire case including the sworn statement, Has the claim been established?" 69 F.2d at 611.

### SCM's Claim Regarding Spare Parts Pricing

SCM, by letter to this Court dated December 13, 1977, has asserted a claim against Van Dyk for overcharges for spare parts totalling $334,085.34. At trial, SCM reduced this claim to $317,706.34.

SCM claims that Van Dyk overcharged SCM for spare parts for a period running from April 1, 1975 until December 1, 1979. Herbert Dew, a financial policy analyst for SCM, employed since January 1975, prepared worksheets representing the alleged overcharges. The total amount of these overcharges was determined by examining Van Dyk spare parts invoices submitted to SCM for the period of April 1, 1975 to December 1, 1979. The exact price charged on these invoices was compared to the 1973 price list, the revised 1975 price list and the 1974 invoices to determine any overcharge. If the price on an invoiced part could not be found on any of these documents, the exact price charged by the debtor was used. Van Dyk argues that these overcharges represent simple arithmetic totals of the differences between the prices paid by SCM during that period of time, and its original 1973 and 1975 price levels.

Van Dyk moreover asserts that SCM's overcharge claim of $317,706.34 was not set forth in its proof of claim filed on November 6, 1975 but was later asserted in a letter to this Court, dated December 13, 1979 as an amendment thereto, more than one month after the order of confirmation of the debtor's second amended plan of arrangement was entered by this Court on November 8, 1979, in violation of the time limitations set forth in § 355 of the Bankruptcy Act and Bankruptcy Rule 11–33(b)(2).

Section 355 of the Bankruptcy Act provides:

> Creditors, including the United States, any State, and any subdivision thereof, shall file their proofs of claim before confirmation, except as follows:
>
> (1) if scheduled by the debtor, a claim may be filed within thirty days after the date of mailing notice of confirmation to creditors but shall not be allowed for an amount in excess of that set forth in the debtor's schedules; and
>
> (2) a claim arising from the rejection of an executory contract of the debtor may be filed within such time as the court may direct. 11 U.S.C. § 755a.

Bankruptcy Rule 11–33(b)(2) further provides:

> (2) Time for Filing. A claim, including an amendment thereof, must be filed before confirmation of the plan, except as follows:
>
> (A) if scheduled by the debtor as undisputed, not contingent, and liquidated as to amount, a claim or an amendment to a claim may be filed within 30 days after the date of mailing notice of confirmation to creditors but in such event shall not be allowed for an amount in excess of that set forth in the schedule; and
>
> (B) a claim arising from the rejection of an executory contract of the debtor, and a post-petition claim allowed to be filed under paragraph (3) of this subdivision, may be filed within such time as the Court may direct.
>
> (C) Bankruptcy Rule 302(e)(3) applies in Chapter XI cases.

The Advisory Committee note to Rule 11–33(b)(2) explicitly provides that "an amendment must be filed within the same time as the original proof of claim and it is not possible to obtain an extension of time based upon the amending process."

SCM did not assert its overcharge claim in its original proof of claim, but first asserted it in a December 13, 1979 letter, filed with this Court, more than thirty (30) days after confirmation of the debtor's Chapter XI plan. The only reference in paragraph 8 of the original proof of claim is to Van Dyk's right to setoff the unpaid invoice of $302,832.32 respecting retroactive price adjustments, a claim separate and apart from SCM's overcharge claim. The stated exceptions to the general rule that claims must be filed before confirmation are not applicable here, since the SCM claim was not scheduled as undisputed and liquidated, it did not arise from a rejected executory contract, or out of a judgment for money or property, and it was not a post-petition tax claim.

While the bankruptcy court, as a court of equity, could extend the statutory period for filing proofs of claim and amendments thereto, to mitigate any undue harshness resulting from such a statutory limitation, under the Bankruptcy Act, the courts have generally refrained from affording such relief. See 3 *Collier on Bankruptcy* ¶ 57.27[2], p. 376–377 (14th ed. 1977); See also *Hi-Flier Mfg. Co. v. Haberman*, 115 F.2d 918 (2d Cir. 1940). Moreover, this Court is convinced that the fundamental purpose of Chapter XI would not be served by allowing an exception to this statutory rule. In *Hoos & Co. v. Dynamics Corp. of America*, 570 F.2d 433 (2d Cir. 1978), the Court of Appeals rejected a letter submitted to an unofficial creditor's committee by a third party more than four months after an order of confirmation of the debtor's Chapter XI plan of arrangement was entered. In so holding, the court commented on the salutary purposes of the time limitations here at issue:

[I]t cannot be said that when a claim has been scheduled by a debtor, the filing requirement imposing time limitations is a purposeless formality. For one thing, it insures that creditors know what they will receive under a plan within a reasonable time after they vote to confirm it. It also helps to avoid fraudulent inflation of amounts due creditors, by a debtor, for his benefit . . . to permit late filing of a scheduled claim . . . would put the bankruptcy courts in the unenviable position of indefinitely having to consider claims whenever some sort of excuse is asserted. Such a procedure would destroy the objective of finality which Congress obviously intended to promote. 570 F.2d at 439.

Accord *In re Western Trading Company*, 340 F.Supp. 1130 (D.Nev.1972).

Accordingly, the overcharge claim of SCM is barred by § 355 of the Bankruptcy Act, and Bankruptcy Rule 11–33(b)(2). The Court believes that the allowance of an additional claim of $317,706.34 would greatly prejudice the confirmed Plan of Arrangement, which is based on the amount of claims filed prior to confirmation, and that the feasibility of such plan might be affected were the Court to allow this claim at this late date.

### Van Dyk's Claim for Setoff of $302,832.32 for Retroactive Price Increases for Spare Parts

The debtor, and the Receiver, by their verified complaint assert a setoff in the amount of $302,832.32 for the September 25, 1975 invoice issued to SCM representing the amount due Van Dyk for retroactive price increases for spare parts sold to SCM by the debtor, under the December 3, 1975 agreement.

SCM contends that Van Dyk breached its June 1975 agreement regarding spare parts pricing so that it is not entitled to a setoff.

Section 68(a) of the Bankruptcy Act allows a setoff of mutual debts and credits between the estate of the bankrupt and its creditors. 11 U.S.C. § 108(a). Section 68 creates no new rights, but is a statutory recognition of the common-law principle of setoff. See 4 *Collier on Bankruptcy*, ¶ 68.-02[1], pp. 848–849 (14th Ed. 1978).

Where the right to setoff is invoked in a bankruptcy proceeding, the granting or denial of same depends wholly upon the terms of § 68 and not upon any common law right or state statute. See *McCollum v. Hamilton National Bank*, 303 U.S. 245, 58 S.Ct. 568, 82 L.Ed. 819 (1938); 4 *Collier on Bankruptcy*, ¶ 68.06, p. 886.1 (14th ed. 1978).

■ In order to have a setoff under § 68, such debts or credits must be valid and enforceable at the time of bankruptcy. See *Luther v. United States*, 225 F.2d 495 (10th Cir. 1954). See also *In re Interstate Record Distributors, Inc.*, 307 F.Supp. 1142 (S.D.N.Y.1970), *aff'd sub nom. Interstate Record Distributors, Inc. v. Columbia Broadcasting System, Inc.*, 430 F.2d 1017 (2d Cir. 1970).

■ As noted above, SCM asserts that Van Dyk breached its June 1975 agreement regarding spare parts pricing, and that the September 26, 1975 invoice does not represent a valid setoff against the sums due SCM from Van Dyk.

Peter C. Kuiker, the Director of Accounting for Van Dyk from February 1975 until October 1977, was responsible for overseeing compliance with the June 1975 spare parts pricing format agreed upon by the parties. He testified that he personally supervised the implementation of the pricing format and that hand-made calculations were made for each part sold to SCM, and later converted to a data-processing system, in the fall of 1975. He stated that these calculations were the basis for the September 26, 1975 invoice sent to SCM. He explained that the work sheets were prepared for eight hundred (800) parts by himself and two other employees of Van Dyk, and kept in three-ring binders. These binders have not been produced in Court, nor could any official of Van Dyk inform the Court of their location.

Van Dyk has stipulated at trial that it was unable to locate the source documents containing the calculations made by it for the September 1975 price list.

Dr. Maxwell Pollack, the President of Van Dyk since its inception in 1964, also could not tell the Court whether Van Dyk

had documents to comply with the pricing format and admitted that he had never seen the certifications relating to packaging and labor costs, or the certification of Van Dyk's vice-president of finance, required under the pricing agreement.

Pogash & Company, the court-appointed accountants, conducted an audit of the debtor in January 1980. They also were unable to find documents to verify the September 1975 spare parts price increases. Israel B. Pogash testified that he was told by Mr. Kuiken that the records for the price list had been "lost" when the debtor company moved its offices to Whippany, New Jersey.

Brenda T. Geiling, a SCM staff auditor, attempted to certify the prices using Van Dyk's own records. SCM's accountants reviewed Van Dyk's purchasing department card file, historical files, open and closed purchase orders and invoice files to identify parts. Using these records, the SCM accountants prepared a schedule recalculating the prices of approximately 800 parts. This schedule does not support the price increase issued by Van Dyk on January 31, 1975 or August 6, 1975. At trial, Geiling also testified to various instances of overcharging by Van Dyk in the sale of spare parts to SCM. Harold Davies, employed by the financial department of Van Dyk, testified that in July 1975 Van Dyk utilized a computer program to price parts, and that file cards were no longer used. Davies, however, was unable to locate the computer print-out for the September 1975 price list. Davies conducted a simulation of the September 1975 pricing, using 1977 cost data, which demonstrated a differential of 0.1% lower prices than actually charged by Van Dyk. Davies admitted here that he used a "revised program" from which he had to work back to the original one.

It is the finding of this Court that no credible evidence was presented by Van Dyk to demonstrate that it prepared the September 1975 price list in accordance with the format agreed upon between it and SCM. Even if such computations were done, whether manually or by computer,

Van Dyk failed to preserve such records so to substantiate its claim to retroactive price increases, and so, such claim must be denied.

*SCM's Claim for Expenses Incurred by SCM for Inadequate Van Dyk Training and Increased Service Costs.*

■ Under paragraph 6(a) of the December 3, 1973 Purchase Agreement, Van Dyk agreed to train SCM personnel to service the Van Dyk 4000 copiers, as follows:

6. *Technical Support and Service.*

a) service program—Van Dyk shall train SCM's servicemen in the operation, maintenance, repair and service of the VDR Machine or other Machines at Van Dyk's training school in Whippany, New Jersey. Such training seminars (i) shall begin as soon after the execution of this Agreement as possible, (ii) shall train ten men at a time for a three week period, (or, at SCM's request, an equivalent period), and (iii) shall continue until all SCM servicemen have satisfactorily completed such training, or until Van Dyk has given at least ten such seminars, whichever is sooner. Van Dyk shall continue to train SCM servicemen thereafter as requested by SCM. The cost to SCM per man shall be as set forth in Schedule B attached hereto, and made a part hereof.

When SCM agreed, by separate agreement dated June 20, 1974, to purchase sorters for the copiers, Van Dyk similarly agreed to train SCM personnel to service the sorter.

SCM, by its proof of claim, seeks to recover the amount of $318,836.04 for expenses incurred by it in the training of SCM personnel at the Van Dyk training school. These expenses include tuition costs, motel, living and travel expenses, and salaries paid to SCM employees. SCM also claims that excess service time, expended by it at customer locations, at a cost of $245,257.00, were a result of Van Dyk's failure to adequately train SCM personnel.

Van Dyk began training SCM personnel to service the copier machine in December 1973, and classes were held at Van Dyk's premises on a regular basis each month thereafter, until November 1974. Van Dyk began training SCM personnel to service the sorter in the fall of 1974 and continued until late 1975. During this time, structural changes made to the sorter necessitated retraining, which courses were also conducted by Van Dyk.

When the servicemen left the Van Dyk class and returned to the SCM branch offices, they were directed to give priority to the servicing of the 6740 copier machines. All 6740 machines were installed by service trainees, who then serviced same. Van Dyk shipped a packet of service call report cards with each machine, which were to be completed by the service men when on call, and sent to Van Dyk for analysis.

During the course of the training, Van Dyk supplied a telephone hotline service to SCM to provide technical assistance and advise service technicians working in the field. Van Dyk fully complied with paragraph 6(c) of the Service Agreement by making Van Dyk servicemen available to SCM for an eight-month period.

At all relevant times, SCM maintained Applied Time Reports, which contained breakdowns of all direct service time spent by SCM personnel. These reports showed service time on the 6740 to be greater than on any other machine in SCM's line. SCM asked Van Dyk to extend the 6740 training course from three to four weeks, which was complied with in April 1974. At this, Robert F. Hart, the then director of Product Services for SCM, testified that Van Dyk was aware of SCM's problems with the 6740 machine, which he characterized as a "crisis" situation.

In November 1974, the last Van Dyk training class for SCM servicemen on the 6740 copier ended.

In October 1974 SCM had commenced its own service training programs for the 6740 machine. SCM's instructor at the school was one Roger Williams, a service technician who had completed the Van Dyk course and received instructor training from Van Dyk, and was qualified as an

instructor on the 6740 copier. These classes continued until March 1979. At no time were students that completed the Van Dyk course retrained by SCM.

In 1974 SCM also stopped sending service call cards to Van Dyk, and instead sent these cards to its own technical service people. A SCM official explained that this was done because SCM did not want Van Dyk to have certain information contained on these cards.

In the latter part of 1975 SCM, at the recommendation of Williams, also stopped sending its personnel to the Van Dyk sorter training courses.

At the outset, it is noted that SCM's claims must be in the alternative. That this is so is clear when it is observed that if SCM were to obtain the relief sought in both part viii of its proof of claim, the actual cost to SCM of the entire training program, and part ix of its proof of claim, purported excessive service time resulting from the allegedly deficient training, that SCM's claims would not only recover the entire consideration expended in exchange for Van Dyk's performance, but it would also be placed in the position it alleges it would have been in had Van Dyk's allegedly inadequate performance been satisfactory to SCM. If the creditor were to prevail on both part viii and part ix of its proof of claim, it would then have both the fruits of the full performance of the debtor and also the consideration paid for that performance.

Is SCM entitled to the return of the consideration paid for Van Dyk's performance under paragraph 6 of the December 3, 1973 Purchase Agreement, and the June 20, 1974 agreement to train SCM personnel to operate, maintain, repair and service the sorter?

SCM, in its proof of claim, seeks to recover the total amount of its expenses incurred by it to train SCM personnel at the Van Dyk courses, in the amount of $442,932.00.

Were this Court to find that Van Dyk failed totally to provide any training to SCM servicepeople, then damages in the amount of the total expenses incurred by it would be recoverable.

It is noted that the Regional Field Engineers who participated in the training program set up by SCM under Edward A. Clay, SCM's Director of Field Engineering, were all trained at Van Dyk. Roger Williams, who ran the SCM training course, was also a graduate of Van Dyk's training program. Moreover, Williams, an SCM employee, testified that most servicemen, as a result of the training provided by Van Dyk, were able to install and repair the SCM 6740. Further, he stated that he and his fellow trainees received something of value from the course. Finally, he noted that with no training on the SCM 6740, other than that provided by Van Dyk, he was able to set up the SCM training course for the SCM 6740. The Court also notes that the servicemen trained by Van Dyk were not sent by SCM to its own training school. Thus, SCM's attempt to recover *all* monies expended for training is not supported by the evidence.

SCM has adduced no proof whatever on the value of the training received by SCM personnel, which admittedly was of some value, from which this Court could ascertain the value of the training provided to SCM by Van Dyk, or the difference, if any, between the contract price for such training and the value of the training actually imparted to the SCM trainees.

While it has been held that damages are not rendered uncertain because they cannot be calculated with absolute exactness, and a defendant upon wrongful conduct has contributed to difficulty in ascertaining the precise damages incurred, is not entitled to complain of said inexactness, it is necessary that a reasonable basis of computation is afforded, even though the result is only an approximate figure. See *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359 to 379, 47 S.Ct. 400 to 405, 71 L.Ed. 684 (1927); *Clements Auto Company v. Service Bureau Corp.*, 298 F.Supp. 115 (D. Minn. 1969), *aff'd in part and rev'd in part* 444 F.2d 169 (8th Cir. 1971).

It was established at trial that from December 1973 until late 1975, SCM paid Van

Dyk approximately $137,640.00 for tuition payments and service manuals. Peter Kemmerer, SCM's Manager of Finance and Administration, prepared an analysis of other training expenses, including motel and travel costs. The computations of these expenses however, are untrustworthy since Kemmerer admitted that he did not have the figures representing SCM's actual expenses for the copier training, but instead used the average cost of training its employees in the sorter. Furthermore, Kemmerer used 1975 prices to calculate 1974 expenses. In view of the absence of reasonably accurate figures to calculate SCM's actual training expenses, the total absence of proof as to the value of the training received by the SCM personnel and the non-compensatory nature of such a damage award, SCM's claim in the amount of $318,836.04 for expenses for Van Dyk training is denied.

In part ix of its proof of claim, SCM seeks $276,893.55 as damages from Van Dyk as a result of the debtor's breach of contract to adequately train SCM personnel to service the SCM 6740 copier and sorter.

> *Williston on Contracts*, § 1338, provides:
> § 1338. Compensation is the Basic Principle of Damages. For the injury caused by the non-performance of most contracts, the primary, if not only remedy of the injured party is an action for damages for the breach...
> In fixing the amount of these damages, the general purpose of the law is, and should be, to give compensation, that is, to put the plaintiff in as good a position as he would have been in had the defendant kept his contract.
>
> *Williston on Contracts*, § 1344, states:
> [A] plaintiff can recover for the breach of contract compensation for only such consequences as would follow such a breach in the ordinary course of events.

■ It is well settled that the awarding of compensatory damages, for breach of contract, is designed to put the injured party in as good a position as he would have been if had the performance been rendered as promised. See *525 Main Street Corp. v.*

*Eagle Roofing Co., Inc.*, 34 N.J. 251, 168 A.2d 33 (1961); 11 *Corbin on Contracts*, § 1338, p. 198 (3rd Ed. 1968). Thus, in determining the propriety of such damage, three issues must be determined: (1) the nature of the benefit contracted for, (2) whether the defendant failed to deliver what was, in fact, bargained for, and (3) whether there is sufficient proof of the amount of damages. See *Giumarra v. Harrington Heights, Inc.*, 33 N.J.Super. 178, 109 A.2d 695 (App.Div. 1954), *aff'd* 18 N.J. 548, 114 A.2d 720 (1955).

The initial question then must be, did Van Dyk breach its contract to train SCM personnel on the SCM 6740 and on the sorter?

SCM and Van Dyk do not dispute that the required number of SCM trainees attended the agreed upon number of Van Dyk seminars. The disagreement herein goes to the quality of the training provided by Van Dyk.

Certain testimony given by one Paul M. Elicker, Chairman of the Board of Directors of SCM indicates to this Court the nature of the service problems SCM encountered with the 6740 copier machine and the perception of those problems by SCM's senior management prior to the cancellation of the contract with the debtor. Statements made by Mr. Elicker at a deposition on March 3, 1978, which will be quoted at length here, are instructive.

Q. Did SCM encounter any problems in servicing the SCM 6740? A. Yes.

Q. Did it encounter any problems in servicing the SCM 6740 that it did not anticipate when it went into the agreement with Van Dyk? A. Yes.

Q. What kind of servicing problems did SCM encounter?

A. A variety of them. These are in no particular order. First of all, we expected service training and specific field assistance from Van Dyk. We didn't get this to the degree that we expected them.

Secondly, we had problems of parts delivery and working properly as sup-

plied by Van Dyk, and obviously parts difficulties relate to service difficulties. We had the normal break in period that you would expect of becoming acquainted with the machine, that perhaps you could say we anticipated; but beyond that, the nature of the machine itself tended to add to some of these difficulties in that it's an excellent machine.

It was at the time the best machine in its class of any machine on the market, but it's a very intricate machine, a well designed but an intricate machine. So that it is hard to learn for a serviceman, and in some of the areas perhaps confusing. I am speaking particularly of the electronics, the diagnostic electronics, of the machine, which are well designed, but hard to master and too, by the fact that we had adopted a very rapid phase in of introduction of machines from the service departments point of view, too rapid a phase in view of countrywide introduction.

Lastly, and perhaps this is, if I had to say so, the most important of all, our placements were fewer than we expected and also much less dense. By dense I mean to say on the one hand, hypothetical example, that there are five machines in the same building or that there are five machines scattered through a wide metropolitan area, or that there are five machines in each of five different metropolitan areas. That degree of dispersion will dramatically increase the service problem so that lack of placements in itself added to our service difficulties.

Q. Could you think of any other service problems that you have that weren't anticipated?

A. Those were the only ones that come to mind right now.

Q. When did SCM first consider cancelling the agreement with Van Dyk? A. In May 1974.

Q. Prior to the expiration of the first six month period? A. That's correct.

Q. What was the reason for SCM's considering cancellation of the agreement at that time?

A. The difficulties we were experiencing trying to make a headway against Xerox and the lack of placements that was its tangible result.

Q. And the service problems you've just described?

A. No. They were never a determining factor. They were, as I indicated, as much as anything either overall normal or the consequence of our competitive difficulties . . .

Q. During the spring and summer of 1974 when the extension was negotiated, did SCM tell Van Dyk there was anything Van Dyk could do to help the situation and possibly avoid cancellation?

A. I recall only one thing which was repeatedly represented to them.

Q. Which is?

A. That was that we said that given the competitive difficulties we had of dislodging Xerox, that it just didn't make sense and jeopardized us all to have to take on a continuing minimum of machines that were still at that point in excess of anything that we had placed in all—I think in any month, Perhaps there was one month on June where we exceeded it.

Mr. Elicker's testimony shows that the management of SCM perceived the service problems with the 6740 copier as normal for a machine of its complexity. More importantly, the testimony reveals that certain competitive difficulties in the marketplace may have contributed to the service problems encountered by SCM during this time rather than a breach by the debtor of its obligation to train SCM personnel.

The testimony of Robert F. Hart, SCM's Director of Products Service, corroborates Elicker's perception that the service difficulties with the 6740 machine were not abnormal. He noted that based upon reports from SCM departments that compiled records indicating the number of customers lost, attributable to service difficulties or the percentage of the machine population

that was lost due to service, it was his opinion that the number of customers lost as a result of service was not high.

Mr. Hart further testified that he was unaware of any case where Van Dyk refused to honor the request of SCM to modify or change any aspect of its training program. He stated that all of the SCM 6740 machines were installed by SCM employees trained by Van Dyk and that the Van Dyk-trained servicemen were, with varying degrees of success, able to service the 6740 copiers. He noted that additional assistance was needed to service the machines and this was obtained, at least in the beginning of the contractual period, from Van Dyk.

George J. Warner, SCM's president of the business equipment division, from 1971 until March 1975 also testified. In the SCM hierarchy he reported to Mr. Elicker. He stated that as of the termination of the purchase agreement on January 30, 1975, that there had been no violations of the terms of the purchase agreement. The determination of whether or not the agreement was in fact breached is, of course, for the Court. However, the perception of Mr. Warner, a senior manager at SCM, is indicative of SCM's opinion of the quality of training SCM was receiving from Van Dyk. Mr. Warner did note that his subordinates related to him a problem in obtaining spare parts from Van Dyk. He further observed that the results obtained from servicemen did not lead him to contact Van Dyk relative to any problem with the service program.

Roger Williams, instructor at the SCM school, also testified that many servicemen trained at Van Dyk had trouble understanding the 6740 machine as a total working unit, in that they did not understand how the various subsystems interacted with each other. Williams gave several detailed examples of the inadequacy of Van Dyk training in regard to both the 6740 machine and the sorter. He noted, for example, that SCM servicemen would replace a number of expensive circuit boards when only one board had failed. He stated that while he used the Van Dyk service manual in his own course, he had made many modifications in it.

Dr. Maxwell Pollack, the President of Van Dyk, candidly admitted that the Van Dyk training course stressed removal and replacement of entire component systems, rather than disassembly or individual components. Dr. Pollack testified that during the period of time from December 1973 to November 1974, SCM never expressed to him any dissatisfaction with the training program. He also stated that he never received any complaint about the sorter training. Further, he observed that he was aware of no instance in which a suggestion from SCM regarding the training program was not implemented. At this point, the Court notes that at the suggestion of SCM, the 6740 copier training course was extended from three weeks to four weeks and an emphasis on troubleshooting was added to the course.

The Court also notes that paragraph 6 of the Purchase Agreement provides that Van Dyk provide ten (10) servicemen to SCM to assist in servicing the 6740 copier, and that Mr. Hart testified that at times, Van Dyk provided more than ten men for this purpose. He also noted that Van Dyk was very cooperative in sending men all over the country to assist SCM in servicing the 6740.

Peter Kemmerer also prepared a statistical analysis of the number of hours per man per machine per month expended by SCM to service the SCM 6740. The source of the statistics was SCM's Applied Time Reports. The analysis covered the period from July 1974 through March 1976. The graph seeks to demonstrate that, in the nine-month period from July 1974 to March 1975, the average service time figure was 11.56 hours. In the period from July 1975 to September 1975, subsequent to SCM instituting its own training programs, the figure dropped markedly from 11.24 in the previous quarter to 9.03 hours, decreasing steadily in the subsequent quarters. This difference of 2.53 hours represents a reduction in service time of 21.89 per cent. Kemmerer aver-

aged the performance level of SCM servicemen at the beginning of the period with their performance towards the end. Kemmerer estimated that if SCM personnel had performed as efficiently in the period from July 1974 until March 1975 as they did in the period from July 1975 to September 1975, SCM would have saved approximately 11,466 service hours.

While Kemmerer explained that certain downward trends in service time might indicate that corrective policies instituted by SCM were working, he could not explain the reason for certain upward trends in the same graph.[1] Kemmerer could not say that the per man per machine per month figures in the graph reflect service time expended by Van Dyk trainees. The witness did not know if the graph which showed 102 men trained by Van Dyk on the 6740 copier and 72 servicemen trained on the sorter included all the servicemen trained by Van Dyk. He also conceded that he did not know if there was any turnover among the 102 Van Dyk-trained servicemen.

Kemmerer observed that he did not know why the lines on the graph went up and that he could only assume that it went down because of the corrective measures taken by SCM. He also noted that included in the per man per month per machine figures was the time spent traveling to the service call. Further, he agreed that if the density of the machine population in any of the service branches increased, service time would automatically go down. He did not relate to the Court, however, whether or not the density of the machine population in any of the service branches increased during the period covered by the graph. Kemmerer produced no figures which would indicate that had the training been proper, the serviceman would have arrived on a service call at, for example, 1:00 p. m., and he would have left at 2:00 p. m. but, because of the improper training, he left at 3:00 p. m.

SCM's claim for damages for Van Dyk's failure to adequately train SCM servicemen must be denied. SCM has failed to demonstrate to this Court that Van Dyk did not deliver the benefit that was bargained for. On the contrary, Van Dyk was at all times cooperative with SCM. For example, at the request of SCM, Van Dyk increased the length of the 6740 copier training course from three to four weeks at no charge to SCM. The testimony also shows that, as a result of the training he received from Van Dyk, Roger Williams was able to establish and operate the SCM 6740 copier training program. Further, the Court notes that none of the Van Dyk-trained servicemen were sent by SCM to the SCM training school.

The testimony also demonstrates that the management of SCM was satisfied with the training provided by Van Dyk, that SCM management considered service problems with the 6740 machine overall normal, and that management's primary concern with the 6740 copier was the marketing of the copier in the face of the competition in the marketplace.

The testimony of Kemmerer does not demonstrate to the Court that service time per man per machine decreased as a result of the corrective measures taken by SCM. Kemmerer admits that he does not know why the graph went up, and can only assume that it went down as a result of actions taken by SCM. Kemmerer concludes, among other facts of which he was unsure, that he did not know if an increase in the density of the population of the machines was responsible for a decline in service time per man per machine per month. The Court notes again, that no proof has been adduced to show that had the Van Dyk training been better, service time would have been reduced. Moreover, all suggestions by SCM pertaining to the training of SCM employees were implemented by Van Dyk.

---

1. The graph offered by SCM shows the following monthly service time figures per man per machine on the SCM 6740 for the periods indicated:

July 1974 . . . . . . . . . . . . . . . . . . . . . . . . . . . .10.86 hours
October 1974–December 1974 . . . . . . . . . . . . . .11.24 hours
January 1975–March 1975 . . . . . . . . . . . . . . . . .12.15 hours
April 1975–June 1975 . . . . . . . . . . . . . . . . . . . . .11.24 hours
July 1975–September 1975 . . . . . . . . . . . . . . . 9.03 hours
October 1975–December 1975 . . . . . . . . . . . . . . 9.27 hours
January 1976–March 1976 . . . . . . . . . . . . . . . . 8.73 hours

In summary, the proofs leave the Court unconvinced that service time per machine per man per month declined over the period covered by the graph. The Court is also unpersuaded that any improvement of service performance, if any took place, is necessarily evidence that Van Dyk did not deliver the training which was required by the purchase agreement and the sorter agreement. The purchase agreement requires that Van Dyk provide a maximum of ten training seminars, for a period of three weeks each. SCM does not dispute that these seminars were not, in fact, conducted. As noted above, the seminars were lengthened to four weeks at the request of SCM.

Thus, SCM has failed to establish its claim in the amount of $276,893.55 for increased service costs resulting from a breach of the agreement to train SCM personnel.

### SCM's Claim for Refurbishing Costs of Parts Allegedly Defective Under Warranty

 Paragraph 5 of the Purchase Agreement of December 3, 1973 sets forth the contractual agreement between the parties with respect to the warranty for spare parts and supplies. The agreement states:

Van Dyk shall replace, without charge for such parts or supplies, any defective spare parts and supplies which SCM, at SCM's cost, shall have returned to the Van Dyk facility designated for this purpose by Van Dyk. Such replacement parts and supplies shall be furnished F.O.B. Van Dyk's plant or facility designated by Van Dyk for such purpose. In the event that SCM shall notify Van Dyk that it claims any parts or supplies shall be defective and shall request Van Dyk to replace such parts, Van Dyk shall ship such part to the address specified by SCM and shall charge SCM therefor, including all related shipping charges. If and when a defective part shall be returned as aforesaid, Van Dyk shall issue an appropriate credit if such returned part shall not be defective.

The parties agree that after they have accumulated sufficient experience as to the return of parts and supplies which are not in fact defective, they will enter into such arrangement as may then be required to compensate Van Dyk for the testing and other handling of wrongfully returned parts or supplies.

In its original Proof of Claim, filed on November 6, 1975 SCM asserted a claim of $19,961.52 for defective parts not yet returned to Van Dyk for credit. By letter dated December 13, 1979 SCM sought to increase this claim to $24,886.16. Of this amount, $10,994.10 was claimed as costs incurred by SCM in refurbishing defective parts in lieu of returning them to Van Dyk for credit, and $13,942.06 for the purchase cost of parts held by SCM which were not refurbishable. At trial, SCM amended this claim to include only the refurbishing costs undertaken by SCM of $10,994.10.

It was established at the hearing that in the late summer of 1975 SCM stopped returning parts to Van Dyk for credit and, instead, began refurbishing the parts itself. H. Barney Marlette, SCM's Manager of Refurbishing and Quality Assurance in 1975 and 1976, testified that in the summer of 1975 SCM decided to refurbish the defective parts itself, and stopped returning the parts to Van Dyk for "paper credit". Marlette explained that this decision was made in consideration of the fact that SCM would have to buy replacement parts at Van Dyk's cost and because there was no assurance that Van Dyk would honor its credit memos issued to SCM. Marlette stated that the costs to SCM to refurbish the parts were less than the costs Van Dyk proposed to charge for refurbishing.

In order to determine SCM's costs in refurbishing these parts, Marlette supervised a three-month study of the average expenses incurred by SCM's repair department to refurbish these parts.

He testified that his department took each part, repaired it and compared prices over a three-month period. Included in these estimates were labor, overhead and replacement costs. From handwritten

sheets of parts returned, prepared by Marlette, a computer run of parts under warranty was subsequently prepared at SCM's parts center in Cortland, New York, by one Robert Scarfone.

On the basis of this computer run, SCM asserts refurbishing costs of $10,944.10. At trial, it was established that the date of purchase of the spare parts does not appear on the computer run generated from Marlette's study. Mr. Scarfone was, in fact, unable to determine whether the various items listed in the exhibit were repaired before or after October 3, 1975.

Notwithstanding the infirmities in the exhibit supporting SCM's claim, it is clear that the agreement between the parties required that SCM return allegedly defective parts and supplies to Van Dyk as a condition to enforce the warranty provision of the agreement. Without such a procedure, there would be no way for Van Dyk to verify if parts were, in fact, defective. The Court here takes note of the testimony of Harold Davies, wherein he stated that a large percentage of parts actually returned to Van Dyk by SCM servicemen proved ultimately not to be defective. Nor is SCM's reason for not returning the subject parts persuasive. Since SCM has not complied with the provisions of the Purchase Agreement, this aspect of its claim must be denied.

In summary, SCM's Proof of Claim is disposed of as follows:

1. SCM's claim for copy paper paid for in advance by SCM and not delivered by Van Dyk is established in the amount of .................. $ 69,088.00

2. SCM's claim for defective parts returned to Van Dyk for credit is established in the amount of ................................ 148,914.53

3. SCM's claim for excess service time expended as a result of inadequate training of SCM personnel by Van Dyk is denied.

4. SCM's claim for overcharges for spare parts in the amount of $317,085.34 is untimely under § 355 of the Bankruptcy Act, and Rule 11–33 (b)(2), and therefore is denied.

5. SCM's claim for the cost of training SCM personnel at the Van Dyk school in the amount of $318,836.04, is denied.

6. SCM's claim for the cost of refurbishing spare parts allegedly failing under warranty, in the amount of $10,994.10 is denied.

7. Van Dyk's claim of a setoff of $302,832.32 for retroactive price increases for spare parts sold to SCM is denied.

TOTAL AMOUNT OF CLAIM ESTABLISHED .............................. $218,002.53

Accordingly, the claim of SCM is allowed in the amount of $218,002.53.

SCM has also moved to dismiss Counts 1, 3 and 5 of the debtor's complaint, or alternatively for summary judgment in favor of SCM on these counts, and to limit discovery thereupon. These counts involve the following claims:

1. Van Dyk's claim to reject the executory aspects of its Purchase Agreement with SCM (Count 1)

2. Van Dyk's breach of contract claim for losses in damages and lost profits suffered as a result of SCM's failure to purchase certain "International Machines" allegedly developed by the debtor for SCM (Count 3)

3. Van Dyk's claim of tortious interference by SCM as a result of its proprietary interests in parts and supplies from Van Dyk's vendors (Count 5)

### Van Dyk's Claim to Reject the Executory Aspects of its Purchase Agreement with SCM

Van Dyk, in Count 1 of its verified complaint, seeks a judgment declaring that SCM breached the December 3, 1973 Purchase Agreement so to discharge the debtor from its future obligations thereunder.

Alternatively, the debtor seeks, pursuant to § 313 of the Bankruptcy Act and Bankruptcy Rule 11–53, to reject and disaffirm the remaining executory portion of the Agreement, including (1) Van Dyk's obligation to sell spare parts to SCM, and (2) Van Dyk's obligation to indemnify SCM in the event of liability incurred by it as a result of certain patent infringement claims brought against it.

SCM has moved to dismiss this Count of the complaint or, alternatively, for summary judgment in its favor.

A motion for summary judgment is governed by Rule 56 of the Federal Rules of

Civil Procedure, made applicable to the Bankruptcy Courts by Bankruptcy Rule 756. Summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Adickes v. S. H. Kress & Company*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Tomalewski v. State Farm Life Insurance Company*, 494 F.2d 882 (3rd Cir. 1974); *Rolle Mfg. Co. v. Marco Chemicals, Inc.*, 92 F.Supp. 218 (D.N. J.1950). The Court is obliged to take a view of the evidence and record most favorable to the party against whom the motion is directed. *First Pennsylvania Banking and Trust Company v. United States Life Insurance Company, City of New York*, 421 F.2d 959, 962 (3rd Cir. 1969).

In support of its motion for dismissal or, alternatively summary judgment, SCM argues that there are no factual issues, and that SCM is entitled to judgment as a matter of law.

SCM contends that Van Dyk cannot reject its obligation to furnish spare parts to SCM since, (1) the debtor never filed a statement of executory contracts, required by § 313 and Bankruptcy Rule 11–11; (2) the complaint seeks to reject the executory contract only in part, in violation of the Bankruptcy Act; and (3) principles of equity militate against disaffirmance.

SCM also contends that Van Dyk's obligation to indemnify SCM is not an executory contract, and so cannot be rejected.

Van Dyk, in opposition to SCM's motion for dismissal or summary judgment, argues that the Court in its sound discretion can allow the rejection of a contract which is not advantageous to the debtor, and that resolution of this issue depends on a factual evaluation of whether the obligations under the contract are, in fact, executory and burdensome to the estate.

There is no evidence before the Court that SCM breached its Purchase Agreement with Van Dyk, so to discharge the debtor from its obligations under ordinary principles of contract law.

Section 313 of the Bankruptcy Act, 11 U.S.C. § 713, however, confers upon the bankruptcy court jurisdiction to "permit the rejection of executory contracts of the debtor, upon notice to the parties to such contracts and to other such parties in interest as the Court may designate." 11 U.S.C. § 713(1). Bankruptcy Rule 11–53 further provides that rejection be by motion with notice of a hearing given to the parties to the contract, and any other person as the Court may direct.

The initial inquiry to be made by this Court is whether an executory contract in fact exists. To be such, the contract must require some future performance of the debtor. See 8 *Collier on Bankruptcy* ¶ 3.15[3], p. 201 (14th ed. 1974). No restriction is placed upon the type of executory contract that may be rejected by the trustee, but instead § 306(4) of the Bankruptcy Act defines executory contracts to include unexpired leases of real property. See 11 U.S.C. § 706(4).

Section 313(1) moreover, does not make mandatory the rejection of executory contracts, but leaves that to the discretion of the Court. Since rejection of an executory contract makes a person injured thereby a creditor, and gives him a provable claim for any damages suffered, under § 353, 11 U.S.C. § 753, and Bankruptcy Rule 11–33(b), the disadvantages of keeping the contract in force must be viewed in light of the liability that may be created by its rejection. See 8 *Collier on Bankruptcy*, ¶ 3.15[8], pp. 206–207 (14th ed. 1978).

In considering SCM's summary judgment motion, this Court will address the contractual obligations of the debtor separately. The debtor's obligation to indemnify SCM will be considered first.

■ Under paragraph 10 of the Purchase Agreement, Van Dyk agreed to "indemnify and hold SCM . . . harmless from any and all actions, claims losses, costs damages or other liabilities which may be incurred or arise on account of the infringement or alleged infringement by machines, by any of their component parts manufactured by or sold by Van Dyk . . . "

Paragraph 10(b)(1) of the Purchase Agreement, however, provided that:

(1) In the event any claims are asserted by Xerox (or any subsidiaries or affiliates thereof) against SCM, in addition to SCM's present counsel, who shall defend against such claims, the expense of which SCM shall continue to bear. Van Dyk may select and appoint such additional counsel as it may deem necessary to defend on SCM's behalf against any such Claims insofar as they relate to infringement and patent validity. The expense of such additional claims and their reasonable and necessary disbursements will be borne by Van Dyk. SCM, nevertheless shall have the option to select and appoint additional or substitute counsel to defend on its behalf against any such claims insofar as they relate to infringement and patent validity, in which case the expense of such additional or substitute counsel and their reasonable and necessary disbursements will be borne by SCM, and which case Van Dyk shall be relieved of its obligations under subparagraph (a) above with respect to such claims.

On September 24, 1976 the Xerox Corporation filed a complaint in the United States District Court against SCM's use and sale of the Van Dyk machines, alleging patent infringement. On October 14, 1977 this Court allowed SCM to amend its Proof of Claim to include the obligation of Van Dyk to indemnify SCM pursuant to paragraph 10 of the Purchase Agreement.

The first issue facing this Court is whether Van Dyk's obligation to indemnify SCM is an "executory contract" under the Bankruptcy Act, or whether it is non-executory in nature, so that SCM is entitled to summary judgment in its favor as a matter of law.

The concept of "executory" contract in bankruptcy has been analyzed in light of the purposes for which the trustee is given the option to assume or reject. Since this is an option exercised when it will benefit the estate, it is not applicable to situations where, for example, the only effect of assumption or rejection would be to prejudice other creditors of the estate. See V. Countryman, *Executory Contracts in Bankruptcy*: Part I. 57 Minn.Law Review 439, 450–451 (1973).

Professor Countryman has commented upon the nature of the contract under which the non-bankrupt has fully rendered the performance to which the bankrupt is entitled, but which the bankrupt has performed only partially or not at all:

Such a contract will give the nonbankrupt party a provable claim in the bankruptcy proceeding, whether it is liquidated or unliquidated, and whether it is absolute or contingent as to liability. The trustee's option to assume or reject should not extend to such contracts. The estate has whatever benefit it can obtain from the other party's performance and the trustee's rejection would neither add to nor detract from the creditor's claim or the estate's liability. His assumption, on the other hand, would in no way benefit the estate and would only have the effect of converting the claim into a first priority expense of administration and thus of preferring it over all claims not assumed—a prerogative which the Bankruptcy Act has never been supposed to have vested in either the trustee or the court. (footnotes omitted). V. Countryman, *Executory Contracts in Bankruptcy*: Part I. 57 Minn.L.Rev. 439, 451–52 (1973).

A series of decisions in the Second Circuit hold that the trustee of one who has guaranteed the obligation of or become a surety for a lessee of real estate cannot reject his debtor's obligation after the lessee's default. See *Hippodrome Bldg. Co. v. Irving Trust Co.*, 91 F.2d 753 (2d Cir. 1937), *cert. den.* 302 U.S. 748, 58 S.Ct. 265, 82 L.Ed. 578 (1937); (guarantor in § 77B proceedings, bankruptcy trustee of lessee had rejected lease); *In re Schulte Retail Stores Corp.*, 105 F.2d 986 (2d Cir. 1939) (surety and lessee both in § 77(b) proceedings; lessee had rejected lease); *In re Grayson-Robinson*

*Stores*, 321 F.2d 500 (2d Cir. 1963) (guarantor in Chapter XI proceeding; lessee had defaulted under lease).

In the *Grayson-Robinson* case, *supra*, the debtor in a Chapter XI proceeding moved to reject certain contracts of guaranty covering a lease. The referee denied the motion. The Second Circuit affirmed and held that the agreement of guaranty was not an executory contract within the meaning of § 313(1) of the Bankruptcy Act, since the contract of guaranty was fully executed between the parties upon the execution of the lease, except for the guarantors' obligation to pay upon the lessee's default. 321 F.2d at 502. The court reasoned that the guarantors' rejection of the contract would merely be a repudiation of his obligations. *Id.*

These Second Circuit cases dealing with guarantors and sureties of lease agreements, however, can be distinguished from the instant case, since in all those cases, the lessees had defaulted on their leases and the guarantors' liability had attached, so that said guarantors had no interest in the lessor's future performance under the same. Here, the liability of SCM on the patent infringement claims brought against it by Xerox has not yet been fixed.

However, it is clear that, in the instant case, Van Dyk's only obligation remaining under this portion of the contract is to pay SCM in the event of liability. Accordingly, it is the decision of this Court that Van Dyk's obligation to indemnify SCM in the event of any liability arising on account of patent infringement claims is not an "executory contract" under the Bankruptcy Act, and so summary judgment in favor of SCM on this portion of the debtor's complaint is granted.

The Court here notes that Van Dyk, by affidavit of one Arthur Sherman, its vice-president, asserts that since SCM has selected counsel on its behalf in the case it is defending against Xerox in the United States District Court, Van Dyk is absolved under paragraph 10(b)(1) of the December 3, 1973 Agreement of any contractual obligation to indemnify against such claims.

The Court must now consider Van Dyk's action to reject its obligation to sell spare parts to SCM. Under paragraph 6 of the Purchase Agreement, Van Dyk agreed to sell spare parts and supplies to SCM "for a period of five (5) years after the last delivery under this Agreement, whichever is later".

The Court takes note of the fact that Van Dyk and SCM have continued to perform under this part of the contract. The debtor's obligation to supply spare parts ran under the contract until May, 1980.

Van Dyk, by affidavit of Arthur Sherman, however, asserts that in fact SCM, from April 1975, has refused to provide the debtor with purchase order commitments for its spare parts and made the debtor's planning for its spare parts inventory impossible. This raises an important issue of fact, as to whether the contract is so burdensome to the debtor estate that rejection by this Court is warranted.

Moreover, SCM has presented no evidence to this Court to prove that Van Dyk seeks to reject only part of the executory contract. Nor is the alleged failure of the debtor to file a statement of executory contract with its schedules and statement of affairs necessarily fatal to relief on this count, since the Court could permit further extensions of time to file upon a showing by the debtor that its failure to take timely action was the result of excusable neglect. See 14 *Collier on Bankruptcy* ¶ 11–11.0[3], p. 11–11–8 (14th ed. 1978).

■ Moreover, this Court in its order of November 8, 1979, confirming Van Dyk's Second Amended Plan of Arrangement, retained jurisdiction "for the purpose of allowing the Debtor to continue to move to reduce, expunge or challenge any claims scheduled by the Debtor or filed herein by creditors and for the further purpose of adjudicating the rights and obligations of the Debtor as to any litigation or claims pending by or against the Debtor and as to any other parties who have filed claims . . . ." This court, having inherent power to reserve jurisdiction over pending mat-

ters, can consider the debtor's application to reject its contract. The debtor, here, moved to reject the executory portions of its contract by verified complaint, July 27, 1977, prior to confirmation of its plan of arrangement. Such action is timely under § 313 of the Bankruptcy Act. Accordingly, SCM's motion for dismissal or summary judgment on this portion of Count 1 of the debtor's complaint is hereby denied.

Having denied summary judgment to SCM on this Count, the Court must now decide whether to allow the debtor to reject its contractual obligation to supply spare parts to SCM.

█ As noted above, under § 313(1) of the Bankruptcy Act, rejection of executory contracts is within the discretionary power of the Bankruptcy Court. Such rejection should be permitted if disaffirmance of the contract is "advantageous to the debtor". *Feldman v. Trans-East Air, Inc.,* 497 F.2d 352, 356 (2d Cir. 1974). However, since rejection of an executory contract constitutes a breach of contract as of the date of filing of the petition under § 63(c) of the Act, 11 U.S.C. § 103(c), and any person injured thereby is deemed a creditor, see § 353, 11 U.S.C. § 753, any disadvantage of keeping the contract in force must be weighed against the liability that may be created by its rejection. See 8 *Collier on Bankruptcy,* ¶ 3.15[8], pp. 206–207 (14th ed. 1978).

█ At trial on SCM's proof of claim, Van Dyk presented no new evidence on the burdensomeness of this contractual obligation. The affidavit of Arthur Sherman, indicating some problem with SCM's supplying the debtor with purchase order commitments, is the only evidence before this Court of any disadvantageous aspect of the contract. In view of Van Dyk's failure to come forward with evidence to support a finding that the obligation to supply spare parts to SCM is burdensome to the estate, and since its commitment to supply parts ran only until May 1980, this Court denies the debtor's application to reject this portion of its December 3, 1973 Purchase Agreement.

*Van Dyk's Claim Alleging Tortious Interference by SCM of its Proprietary Interests*

Van Dyk asserts that SCM's alleged solicitation of Van Dyk's vendors to purchase spare parts constitutes tortious interference with Van Dyk's business and contractual relationships with such vendors and an inducement to said vendors to breach certain confidentiality agreements they held with the debtor. SCM here argues in support of its motion that (1) the procedure for disposition of this claim has been agreed to in the August 5, 1976 stipulation of settlement between the parties, and that (2) Van Dyk's claim of a proprietary interest in said spare parts is without merit as a matter of law, and outside the jurisdiction of the Court to decide.

Van Dyk argues that granting summary judgment on this Count will be premature since discovery is necessary on this Count.

Under the stipulation of settlement dated August 5, 1976 Van Dyk and SCM agreed:

That counsel for Van Dyk will furnish to counsel for SCM Specification 126, which contains a list of the spare parts of the SCM 6740 machine, identifying those in which Van Dyk claims a proprietary interest by checking those spare parts which it concedes are not proprietary. SCM's counsel will thereafter advise Van Dyk's counsel as to those parts for which it does not dispute Van Dyk's proprietary interests for the purpose of this proceeding. The parties will thereafter attempt to come to an agreement on the list, and if such parts are so agreed to be proprietary, SCM will only approach manufacturers who supply such parts to Van Dyk with respect to those parts if SCM provides to such manufacturers the tooling and/or drawings necessary for such manufacturer to produce such parts for SCM.

The list of manufacturers making products in which Van Dyk claimed a proprietary interest was supplied to SCM in May 1977.

It is clear that the settlement agreement relied upon by SCM contains no agreement

by the parties regarding a final disposition of this claim. At most, the parties agreed to "attempt" to come to an agreement on those parts in which Van Dyk claimed a proprietary interest. The execution of said agreements does not preclude the debtor from proceeding to trial on its claim.

The Court must now address the jurisdictional claim of SCM. Paragraph 5(f) of the Purchase Agreement provides:

Subject to Paragraph 18(b) hereof, [Van Dyk's retention of its patent, trademark and trade name] nothing herein contained shall obligate SCM to purchase spare parts and supplies exclusively from Van Dyk, or to prevent SCM from manufacturing such spare parts and supplies itself.

It is clear that Van Dyk, by this agreement, gave to SCM the right to purchase spare parts from other sources, and also to manufacture these parts itself. SCM asserts that having sold to SCM the right to manufacture of the parts for the machine, Van Dyk disposed of the *res* and put beyond the jurisdiction of this Court any exclusive proprietary rights in these parts.

 Under the Bankruptcy Act, this Court possesses summary jurisdiction over property in the possession of the debtor. See *Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 (1940). However, if property is in the possession of a third party, the Court is without summary jurisdiction to act covering said property, unless the third party's possession is based upon a spurious claim. *Cline v. Kaplan*, 323 U.S. 97, 65 S.Ct. 155, 89 L.Ed. 97 (1944).

In the case of *Walker Manufacturing Co. v. Bloomberg*, 298 F.2d 688 (1st Cir. 1962), relied upon by SCM, the trustee in bankruptcy sought a restraining order and injunction against the plaintiff's use of a certain manufacturing process of coating automobile parts with ceramic materials, claiming it was in its exclusive possession on the date the petition in bankruptcy was filed. There, the court stated that the question of summary jurisdiction depended on a finding that the process in question

was owned and under the exclusive control of the debtor on the date of the petition. 298 F.2d at 693.

 SCM has not here asserted nor proven that it possessed any control or knowledge of these specifications or plans, which are the subject of Van Dyk's claim, as to take it outside the jurisdiction of this Court. Nor does the debtor's sale to SCM of the exclusive rights to manufacture said parts constitute a public disclosure of the debtor's trade secrets contained in said parts, which would defeat its claim. The sale of a product containing trade secrets constitutes a public disclosure, sufficient to defeat a claim on same, only where the trade secrets are easily ascertainable by inspection of the product. See *Midland-Ross Corp. v. Sunbeam Equipment Corp.*, 316 F.Supp. 171 (W.D.Penn.1970); *aff'd per curiam* 435 F.2d 159 (3rd Cir. 1970). See also *Carver v. Harr*, 132 N.J.Eq. 207, 27 A.2d 895 (Ch. 1942); *Pen Carbon Manifold Co. v. Tomney*, 90 N.J.Eq. 233, 110 A. 445 (E. & A. 1919); *Seal-O-Matic Machine Mfg. Co., Inc. v. C & M Engineering & Mfg. Inc.*, 21 N.J.Super. 311, 91 A.2d 173 (Ch.Div.1952). SCM, in these proceedings, has neither pleaded nor proven this fact.

It is clear that, at the time of the bankruptcy, SCM owned the right to manufacture parts for the Van Dyk copier machines. Yet the *res* in which Van Dyk claims a proprietary interest, is not the exclusive manufacture of parts and supplies for its machines, but certain plans, drawings and specifications, patterns and tooling it has developed for such parts and supplies, which it claims are valuable trade secrets not generally known in the industry, which has been imparted to Van Dyk's vendors in confidence.

Thus, it is the decision of this Court that it has jurisdiction to proceed upon the claim of the debtor to a proprietary right in the allegedly confidential plans, drawings, specifications and patterns, and tooling, developed by the debtor for spare parts and supplies.

Accordingly, SCM's motion for dismissal or summary judgment on this Count of the complaint of the debtor is denied. However, since the debtor produced no evidence at trial to support its claim that SCM tortiously interfered with its proprietary interests, such claim is also hereby denied.

*Van Dyk's Claim for Damages and Losses Caused by SCM's Failure to Place Orders for its International Machine*

■ Van Dyk, in the third count of its complaint, alleges damages and losses suffered by it as a result of SCM's failure to purchase certain "International Machines" it allegedly developed for SCM, in breach of the agreement between the parties.

Under paragraph 11 of the Purchase Agreement of December 3, 1973, Van Dyk agreed to "proceed immediately to complete the engineering and development of the International Machine and shall be ready to accept SCM's orders for said International Machine by April 15, 1974".

SCM was granted "exclusive and worldwide" purchasing and distribution rights to said Machine under paragraph 4 of said Agreement. Van Dyk further alleges, by affidavit of its President Maxwell A. Pollack, that SCM pressed the debtor to comply with the deadlines for completion of the International Machine and that Van Dyk proceeded to complete development of said Machine and was ready to accept SCM's orders, but SCM failed to place such orders, causing damage to the debtor.

In support of its motion for dismissal of, or summary judgment of this count of the debtor's complaint, SCM contends that it made full payment to the debtor, pursuant to the contract, for work done by Van Dyk on the International Machine in the amount of $100,000.00, which constituted a settlement of this claim.

The December 3, 1973 Purchase Agreement stated that, in the event of termination of the contract,

SCM shall reimburse Van Dyk in an amount not to exceed One Hundred Thousand Dollars ($100,000.00) for its costs, from December 3, 1973 to the date of the completion or termination, whichever is earlier, in completing the engineering and development of the International Machine, as provided in Paragraph 11, hereof. . . .

An invoice dated January 30, 1975 was sent to SCM by Van Dyk stating, "Amount due Van Dyk per contract $100,000", which SCM honored. In an internal Van Dyk memorandum, dated January 30, 1975, Mr. Arthur Sherman, vice-president of Van Dyk, indicated that total development costs of the International Machine were $233,019.00, and that "in any event, the direct, unburdened costs are well above the $100,000.00 maximum collectible figure".

SCM argues that this memoranda evidences Van Dyk's understanding that the maximum amount payable under the contract was $100,000.00.

Van Dyk, in opposition to this motion, argues that (1) SCM's payment of $100,000.00 was in accordance with its contractual obligation to reimburse Van Dyk for engineering and development costs *only*, and does not include payment on account of the debtor's claim for damage and loss of profits alleged herein, and that (2) the doctrine of equitable estoppel precludes SCM from avoiding liability for its failure to purchase the International Machine.

This Court agrees that payment of $100,000.00 by SCM was in settlement of the debtor's claim for engineering and development costs only, and does not preclude the debtor's present action for other damages and loss of profits. Whether an estoppel should arise to preclude SCM from avoiding liability for its failure to purchase the International Machine depends upon a factual evaluation of SCM's conduct. See *Summer Cottagers' Association of Cape May v. City of Cape May,* 19 N.J. 493, 117 A.2d 585 (1955); *West Jersey Title and Guaranty Company v. Industrial Trust Company,* 27 N.J. 144, 141 A.2d 782 (1958). Such a determination requires additional fact finding by the Court.

Accordingly, SCM's motion for dismissal of, or summary judgment on Count Three of the debtor's complaint is denied.

However, since the debtor, at trial, produced no evidence tending to prove damages and losses caused by SCM's failure to place orders for the "International Machines", that claim is also hereby denied.

Submit the appropriate orders, in accordance with the above Opinion.